notice, he is nominally, and for the purpose of enforcing this act deemed a bankrupt from the time he applies to the court. And I have no doubt that congress intended to subject him to examination from the time he applied to be made a bankrupt. But it also appears by another section, that it was intended to subject him to the orders of the court; and that he cannot get his discharge until he complies with all the orders of the court; and one of the orders of the court is, that certain matters shall be sent to the commissioners; and if the court order the bankrupt to go to the commissioners for examination, it is as much an order as it would be to desire him to show his books; and it is an order in strict conformity with the act. But the court is also authorized to proceed summarily as in chancery. And in summary proceedings in equity, it is the ordinary practice to send matters before a master in chancery for examination. In either point of view, he is therefore bound to go before the commissioners for examination, before he is declared a bankrupt. He is bound to go there, because it is one of the orders of the court, which he is bound to comply with, or because it is a proceeding in the nature of equity, and in either of these points of view he is bound to go there, and the court has power to make him do it. The act manifestly intended that the creditor should have the right to go into the whole matter, in order to show, if he can, that the petitioner has not complied with the law, and thus cut him off from a decree.

There can be no doubt, that when the framers of this act first prepared it, they contemplated only the voluntary bankruptcy, but it was afterwards thought better to couple with it the involuntary, and in order to do so this mode of proceeding was provided. It would of course be unjust to let a creditor proceed against a bankrupt, without giving him any remedy, and it is manifest that congress intended to let the debtor come in and show that the creditor had no right to stop his business and take away his property, and it therefore gave him this proceeding to counteract it. But in doing so they have attached to the voluntary proceeding the same privilege as to the involuntary proceeding, and have given to the creditor the same power as to the debtor, and in both cases it is competent for the parties to show, by matter of fact or law, why the proceeding should not go on. It is sometimes the interest of the creditor to prevent the bankrupt getting a decree, as his not doing so might better insure individual debt, and therefore it was his interest to prevent him. Ordinarily it is for the interest of all parties that the proceeding should go on and the property go to the assignee. But the creditors have liberty in this incipient stage of the proceeding to show that the bankrupt is not entitled to a decree.

## Case No. 8,179.

### In re LEE.

[14 N. B. R. 89; 23 Pittsb. Leg. J. 196.] [1]

District Court, N. D. New York. March, 1876.

BANKRUPTCY—ILLEGALLY PREFERRED CREDITORS—RIGHT TO PROVE DEBT—TWO CLAIMS, ONLY ONE PREFERRED.

1. The amendments of 1874 [18 Stat. 178], so far as they change the existing law in reference to the rights of assignees to recover property transferred in contravention of the bankrupt act [of 1867 (14 Stat. 517)]: and in reference to the proof of debts by creditors who have taken a preference, are not retroactive and do not apply where the proceedings in bankruptcy had been previously commenced.

[Cited in Warren v. Garber, Case No. 17,196.]

2. Under the prior law a preferred creditor who did not surrender his preference until he was compelled to do so by the judgment of a court, could not prove his debt.

3. If a preferred creditor has two separate claims and receives a preference on one of them alone, he may prove the other.

[Cited in Re Aspinwall, 11 Fed. 138.]

[In the matter of John F. Lee, a bankrupt.]

WALLACE, District Judge. I am of opinion that the Security Bank is not entitled to prove the claim upon which it received an illegal preference in 1872. This conclusion necessarily involves the decision of two questions against the bank, upon both of which my views conflict with authorities entitled to great respect.

First. The amendments of 1874, so far as they change the existing law in reference to the rights of assignees to recover property transferred in contravention of the bankrupt act, and in reference to the proof of debts by creditors who have taken a preference, are not retroactive, and do not apply where the proceedings in bankruptcy had been previously commenced. If the amendments had merely removed a prohibition in the nature of a penalty upon creditors who had taken a preference, without affecting the substantial rights of others, there would be no difficulty in giving it retrospective effect. But it is to be observed that by the same amendment and in the same sentence two vigorous innovations upon the existing law are introduced, one of which defeats a recovery by an assignee where his right was clear, and the other diminishes a fund for the resort of innocent creditors, by authorizing another class of creditors to share in its distribution, who were theretofore precluded from doing so because of their wrongful acts. The former, in effect, alters a rule of property affecting the validity of all titles derived from bankrupts since the act went into operation; the latter defeats one of the most valuable advantages conferred upon innocent creditors. If one is retrospective, both are; for there is no language in the

1 [Reprinted from 14 N. B. R. 89, by permission. 23 Pittsb. Leg. J. 196, contains only a partial report.]

section which permits a discrimination in favor of one, and against the other. If retrospective, the legislation disregards the settled doctrine that the character and consequences of particular acts are to be determined by the law in force, when the acts were done. In reliance upon the statute as it existed, many proceedings in bankruptcy had been instituted by creditors to obtain a distribution of assets in conformity with its provisions, and many actions were pending, brought by assignees upon the faith of those provisions. The injustice of depriving these creditors of the fruits of their diligence and of the benefits of the expenditures which they have incurred, is manifest; and no construction, not required by plain language, should be given to the amendments which would work this result. The general rule is well settled that, in the absence of plain and unequivocal language requiring it, a retroactive operation is not to be given to a statute. While this rule is greatly modified in construing repealing statutes and acts regulating procedure in actions, it has been repeatedly applied to such legislation when substantial rights of action or remedies would otherwise be injuriously affected. Thus, acts changing statutes of limitation, rules of evidence, rights of appeal and of redemption, creating new defenses or modifying previous remedies, have been repeatedly limited in their operation to cases arising after the passage of the act. In the absence of any language in the amendments indicating the legislative intent that these provisions shall apply to pending proceedings, I am clearly of opinion that they should be confined to cases arising after the amendments were passed. By the same amendment, new provisions in the act which relate to the form and requisites of proceedings for involuntary adjudication are made retroactive, and by express language applicable to all proceedings commenced after December 1, 1873; but the rights of parties prosecuting such proceedings are saved by provisions authorizing the proceedings to be conformed to the new requirements. By implication this limits the operation of the amendments to these proceedings only, and affords strong evidence of the legislative intent that the changes should not be otherwise retroactive.

Second. Treating the case as one to be determined by the law in force prior to the amendments, the creditor who has not surrendered a preference until he has been compelled, after contest, to do so by the judgment of the court, is precluded from proving the debt upon which the preferential payment was received. I have held repeatedly that under the terms of the 23d section of the act, prior to the amendment, a voluntary surrender was a prerequisite to the right to prove, and that it was too late for the creditor to avail himself of the privilege after he had elected to contest the assignee's

title to the money or property preferentially received. Whether the action of the creditor was in actual fraud of the act, or only a constructive fraud upon it, he is chargeable with knowledge of its illegality, and must be assumed to have made his election with such knowledge. As to the note for one thousand and seventy-three dollars and eighty-six cents, of date of December 13, 1871, it does not appear that any part of the preference, received by the bank, was received upon this note. On the contrary, the payments were made with the intention that they should be applied upon the other obligations upon which the bankrupt was liable to the bank, and they were applied accordingly. The bank is entitled to prove this note against the estate of the assignee. The decision of the court is, that the claim of the Security Bank be disallowed and its proof of debt expunged, except as to the amount due upon this note.

## Case No. 8,180.

### LEE'S CASE.

[22 Leg. Int. 284;[1] 6 Phila. 96.]

Circuit Court, E. D. Pennsylvania. July 17, 1865.

HABEAS CORPUS—FLIGHT WHILE UPON BAIL—CONTEMPT—RIGHT THEREAFTER TO BE AGAIN LIBERATED—PARDON — NOMINAL PUNISHMENT THEREAFTER.

1. A person accused of a series of crimes, under each of two distinct heads, was, after a regular commitment, liberated upon a regular recognizance of bail, on the usual condition to appear in court to answer any charges, and not depart without leave. Under one of the heads of accusation, three bills of indictment were afterwards found for certain of the offences with which he was charged. He was tried, under one of these indictments, and convicted. Before sentence he absconded. Having been afterwards arrested and brought into court, he was under this conviction, sentenced to pay a fine and undergo a certain imprisonment. By a special pardon, this imprisonment was remitted, on condition that the fine should be paid. The pardon did not apply to the charges in the other two indictments for offenses under the same head of accusation as the offence of which he had been convicted, nor to any of the offences charged under the other head of accusation. The fine having been paid, and his imprisonment under the sentence having been terminated by the pardon, he was in custody under a recommitment to answer the other charges. Upon a subsequent application by him to be admitted to bail, his flight was considered such a wilful breach of the essential condition of his liberation upon bail that his privilege of such liberation had been forfeited.

2. This forfeiture of the privilege was independent of, or collateral to, the contempt of court which had been incidental to the wilful breach of the condition. Therefore, after the contempt was purged, or sufficiently punished, his detention in custody, without admission to bail, might be continued under the recommitment.

3. A renewal of the forfeited privilege of liberation upon bail was not demanded of right, and could not be reasonably asked of grace, nor allowed under an exercise of properly regulated ju-

---

[1] [Reprinted from 22 Leg. Int. 284, by permission.]